IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

v.

ANDRE JUANE SPEAKS,

       Defendant.

2:25-CR-017-Z-BR-(1)

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Andre Juane Speaks' ("Speaks") Motion to Suppress Stop, Detention, Arrest, and Evidence ("Motion") (ECF No. 49), the Government's Response ("Response") (ECF No. 52), Defendant's Reply ("Reply") (ECF No. 56), and the Government's Supplemental Brief in Support ("Sur-Reply") (ECF No. 59). Defendant moves to suppress evidence stemming from a traffic stop and car search. Defendant argues the search violated his Fourth Amendment rights under the U.S. Constitution and his rights under Article I, Section 9 of the Texas Constitution. *See* ECF No. 49 at 1. For reasons stated below, the Court **DENIES** the Motion.

### BACKGROUND

On January 21, 2025, Amarillo Police Department ("APD") officers conducted a traffic stop on a vehicle driven by Speaks. That stop, and a subsequent search of the car, yielded a firearm and a digital scale with drug residue. Speaks now seeks to suppress evidence obtained from the stop and search, including the stop and video thereof, Speaks' arrest, Speaks' statements made after arrest, items found on Speaks' person, evidence seized from the 2018 Chevrolet Malibu bearing Texas license TPJ6671, and the "black colored Taurus 9mm SN firearm TLP02639." ECF No. 49 at 10.

1

*Surveillance at the "Trapp" House*

Speaks drew the attention of law enforcement earlier that day. First, he visited a residence suspected of illegal narcotics distribution. ECF No. 65 at 23–24. The residence belonged to Dvonta Trapp. Officers previously arrested Trapp's girlfriend for possession of crack cocaine and methamphetamine. *Id.* at 22. After attempting to pass drugs to Trapp during the arrest, she made jail calls to him. *Id.* The contents of those calls indicated to law enforcement that Trapp was involved with narcotics distribution, as did the woman's admissions during an interview and an anonymous tip that Trapp had been distributing out of his prior residence. *Id.* at 22–24. This led law enforcement to perform surveillance on Trapp's house. *Id.* at 23. On January 21, 2025, after observing other short-term visitors, at least one of whom had a history of drug possession, officers witnessed Speaks visit the "Trapp" house. *Id.* at 24–25.

Officers noted that Speaks entered the "Trapp" house at 12:55 p.m. and exited at 1:15 p.m. *Id.* at 54. The twenty-minute visit was consistent with narcotics distribution. *Id.* at 38. Speaks arrived and left in a dark blue Chevrolet Malibu. *Id.* at 25. When officers reviewed the license plate database, they determined the car was registered to Antreicka Grady. Officer Mincher compared the driver's face to photographs of Andre Speaks and confirmed it was him. *Id.* at 27. Mincher is an Amarillo Police Officer with twenty years of law enforcement experience, five years of experience with the Drug Enforcement Administration, and extensive training in narcotics investigations. *Id.* at 18–19. Having determined Speaks' identity as the driver, Officer Mincher recognized his name from previous investigations for narcotics distribution and firearm possession. *Id.* at 26. Mincher also recalled that Speaks had been stopped while driving that same Malibu with a fugitive passenger. *Id.* at 28; Def.'s Ex. 4, at 17. Officer Lichtie, another observing officer, knew from previous interactions with

2

Speaks that he was a meth addict with gang affiliations. *Id.* at 59, 61–62. Lichtie even heard Speaks describe himself as "muscle" and a "shooter and a fighter" for his gang. *Id.* at 62. When Speaks left the "Trapp" house, officers followed him—first to the car wash, then the Red Roof Inn. *Id.* at 28.

### *Surveilling Speaks*

Based on his education, training, and experience, Mincher knew the Red Roof Inn had a reputation for frequent illegal activity on its premises. *Id.* at 29. Mincher also noted that Speaks backed his car into a motel parking space at the Red Roof Inn. *Id.* at 30. Though innocuous on its own, Officer Mincher knew from experience that individuals sometimes back into motel spaces to prepare a speedy getaway. *Id.*

When Speaks left the Inn, the observing officers quickly lost contact with him. *Id.* at 31. They used their police radio to request assistance from other officers. *Id.* Officers Kennedy and Kinnison responded. Kennedy and Kinnison were members of APD's Proactive Criminal Enforcement ("PACE") Unit. Mincher and Lichtie communicated with them via phone and radio about Speaks. *Id.* at 31–32, 134. Mincher informed Kinnison and Kennedy of Speaks' visit to a suspected drug house and his criminal history. *Id.* at 34, 44. Some information about Speaks' previous stop in the same vehicle was also communicated. *Id.* at 135.

### *The Traffic Stop*

Next, Kinnison and Kennedy located Speaks—now with a female passenger. *Id.* at 33. They followed him on I-40, which the officers knew to be a common channel for drug trafficking. *Id.* at 140–41, 153. Kinnison and Kennedy determined that Speaks had no valid driver's license, despite operating Grady's vehicle. *Id.* at 75. Around 4:00 p.m., they also observed Speaks fail to signal a lane change and noticed that the car had tinted windows— likely beyond legal limits. *Id.* at 78. Kinnison and Kennedy performed a traffic stop near exit

65 on I-40 westbound. *Id.* at 77. Speaks stopped the car on an improved shoulder before the exit. *Id.* at 79. Due to heavy I-40 traffic, the officers were forced to approach the passenger side. *Id.* at 82.

The officers asked for identification and received Speaks' state I.D. card, as well as the passenger's I.D., which confirmed her identity as Antreicka Grady. *Id.* at 82–83. At this point, the officers knew of Speaks' criminal history. *Id.* at 136. Kennedy searched law enforcement's database but located no active warrants for Speaks or Grady. *Id.* at 83. The officers then asked Speaks to step out of the car to talk. *Id.* at 84. As they spoke, Speaks stated he was currently "on federal paper," by which he meant probation or supervised release for a Felon in Possession conviction. *Id.* at 85. Kinnison noted Speaks's attire displayed the color blue on nearly every visible article—his hat, hoodie, shoes, pants, and even his underwear. *Id.* In Kinnison's training and experience, that much blue was consistent with a gang affiliation, specifically the Crips. *Id.* Next, Kinnison measured the window tint with a device. It registered 13 percent, well below the required minimum of 25 percent. *Id.* at 86. During this measurement, Grady operated the passenger window, rolling it mostly up. No officer asked her to keep it open or to roll it back down thereafter. *Id.* at 92–93; Def.'s Ex. 5, at 16:08:22–16:34:00.

Kinnison requested permission from Grady to search the car. She denied it. He continued, asking her if there was marijuana in the car. She said no. ECF No. 65 at 86–87. He asked if there was cocaine in the car. Again, she said no. *Id.* at 87. Then, Kinnison asked if there were firearms in the car. Grady's response changed. She stated there were none she was aware of, then asserted she entered the car mere moments ago and had not left the house in a month because of her new infant. *Id.* at 87–88. Kinnison took Grady's change in response—from definitive to noncommittal—to suggest she might have known there was

4

contraband in the vehicle but wanted to distance herself from it. *Id.* At that point, Officer Kennedy called for a K-9 unit to assist. *Id.* at 89.

Next, the officers asked Speaks for consent to search the vehicle. He denied consent. *Id.* at 90. Speaks became agitated, raising his voice and accusing the officers of "harassing" him. Def.'s Ex. 5, at 16:12:45–16:12:55. Even after hearing he would receive only a warning ticket for the window tint, Speaks remained upset and persisted in his accusations. ECF No. 65 at 89–90. Knowing the K-9 unit was en route, Kinnison asked Grady to step out of the vehicle and sit in his squad car. *Id.* at 91. Kennedy attempted to write a warning ticket for window tint on his phone but encountered technical issues. Neither officer could access the system, which was recently adapted for smartphone use. *Id.* at 95–96. As PACE officers, Kinnison and Kennedy rarely dealt with the ticket-writing system. *Id.* at 97. They needed assistance to write the ticket and elected to wait on Officer Skaggs, who was nearby and inbound with his K-9 Unit. *Id.* at 96–98. Ticket-writing typically takes between five and fifteen minutes, depending on several variables. *Id.* at 120.

*The Canine Free Air Sniff*

Officer Skaggs arrived on the scene approximately one minute later, roughly twenty-three minutes after the stop began. Def.'s Ex. 5, at 16:23:48–16:24:00; Def.'s Ex. 7, at 16:24:30–16:25:18. He began to conduct a free-air sniff with his dog, Sharo. ECF No. 65 at 98–99. Intending to start at the front passenger side of the vehicle, Skaggs walked past the passenger door. *Id.* at 199. The front passenger window was left open by Ms. Grady. As Sharo neared the open window, he stopped, noticeably changing his breathing pattern. *Id.* at 210–11. Sharo quickly placed his paws on the front passenger door, below the window. *Id.* at 200. As he did so, he focused on the passenger door, looking back and forth between the window and his handler. *Id.* at 191, 210–11; Def.'s Ex. 5, at 16:27:20–16:27:43. Then, without other

5

warning, he leapt through the window into the passenger seat. *Id.* at 178. Sharo quickly sniffed the interior and attempted to sit, but the movement became awkward against the passenger door's interior. *Id.* at 179. Skaggs opened the door and gently retrieved the dog. Def.'s Ex. 5, at 16:27:37–16:27:45. As he returned to his vehicle with Sharo, he told Kinnison that Sharo had "alerted." ECF No. 65 at 99. This was at approximately 4:28 p.m., less than thirty minutes from when the traffic stop began. *Id.* Skaggs was then able to write the warning ticket using his device software. *Id.* at 100.

Following Sharo's alert, officers searched the car and found a firearm, as well as a digital scale with white residue. *Id.* at 99; Def.'s Ex. 4, at 10, 13. Speaks was arrested, charged with Convicted Felon in Possession of a Firearm, in violation of 18 U.S.C. Sections 922(g)(1) and 924(a)(8), and now seeks to suppress evidence uncovered from the stop and search. ECF Nos. 13, 49.

### LEGAL STANDARD

When law enforcement violates a defendant's Fourth Amendment rights, the remedy is to exclude the wrongfully obtained evidence. *See Mapp v. Ohio*, 367 U.S. 643, 655 (1961). The Fourth Amendment instructs that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. CONST. amend. IV. As currently interpreted by the Supreme Court, this command protects an individual's "reasonable expectation of privacy" from invasion by law enforcement. *Katz v. United States*, 389 U.S. 347, 361 (1967); *Kyllo v. United States*, 533 U.S. 27, 33 (2001) ("[A] Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable.").

Reasonableness, as a rule of thumb, demands a warrant prior to search or seizure. *See Katz*, 389 U.S. at 357. Yet, exceptions abound. Phyllis T. Bookspan, *Reworking the Warrant*

6

*Requirement: Resuscitating the Fourth Amendment*, 44 VAND. L. REV. 473, 501–02 (1991) (listing exceptions to the warrant requirement). While the current array of exceptions might appear discordant with *Katz*'s portrayal of warrantless searches as "per se unreasonable under the Fourth Amendment," it harmonizes with the textual demand for "reasonableness" in its application. *Compare Katz*, 389 U.S. at 357, *with* Akhil Reed Amar, *Fourth Amendment First Principles*, 107 HARV. L. REV. 757, 759 (1994) (arguing the Fourth Amendment's words "do not require warrants, probable cause, or exclusion of evidence, but they do require that all searches and seizures be reasonable"), *and Ohio v. Robinette*, 519 U.S. 33, 39 (1996) ("We have long held that the 'touchstone of the Fourth Amendment is reasonableness.'") (quoting *Florida v. Jimeno,* 500 U.S. 248, 250 (1991)).

While a defendant generally bears "the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of his constitutional rights," that burden shifts to the government when its agents conduct a warrantless search or seizure. *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001). The officers who stopped Speaks and searched the car did so without a warrant. Therefore, the government must prove, "by a preponderance of the evidence, that the search or seizure was constitutional." *Id.*

### ANALYSIS

Two warrant exceptions apply here. First, the Fourth Amendment permits brief warrantless seizures upon reasonable suspicion of illegal activity. *Terry v. Ohio*, 392 U.S. 1, 30–31 (1968); *United States v. Grant*, 349 F.3d 192, 196 (5th Cir. 2003). That rule encompasses traffic stops. *See Grant*, 349 F.3d at 196. Second, officers may perform a warrantless search of an automobile where probable cause exists. *United States v. Ross*, 456

U.S. 798, 809 (1982); *United States v. Banuelos-Romero*, 597 F.3d 763, 767, 501–02 (5th Cir. 2010).

Here, Speaks claims the officers twice violated his rights. First, he argues they unreasonably detained him during the traffic stop. Second, he contends the free air sniff conducted by a police canine became a *search* when the dog leaped through the car's open window. The Court addresses each argument in turn.[1]

## I. Officers did not violate Speaks' Fourth Amendment rights by detaining him until the canine unit arrived.

First, the detention. "The stopping of a vehicle and detention of its occupants constitutes a 'seizure' under the Fourth Amendment." *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004). The Fifth Circuit, "following the Supreme Court, has treated routine traffic stops, whether justified by probable cause or a reasonable suspicion of a violation, as *Terry* stops." *Id.* That framework requires a "two–tiered reasonable suspicion inquiry." *Grant*, 349 F.3d at 196. Courts first ask "whether the officer's action was justified at its inception," then, second, "whether the search or seizure was reasonably related in scope to the circumstances that justified the stop in the first place." *Id.*

---

[1] Alongside his Fourth Amendment arguments, Speaks asserts his rights under Article I, Section 9 of the Texas Constitution. This provision, the state's Fourth Amendment parallel, has generally been interpreted as coterminous with the Fourth Amendment to the United States Constitution. *See, e.g., Hernandez v. State*, 876 S.W.2d 900, 908 (Tex. Ct. App. 1993) (holding "current interpretation of Article I, § 9 is consistent with interpretation of the Fourth Amendment"); *Hill v. State*, 951 S.W.2d 244, 248 (Tex. Ct. App. 1997) ("A plain reading and comparison of the language of the Fourth Amendment and Article I, Section 9, however reveals no substantive difference, and since *Heitman*, the Court of Criminal Appeals has identified very few instances where the Texas Constitution affords greater protection than the Fourth Amendment."); *Hulit v. State*, 982 S.W.2d 431, 436 (Tex. Crim. App. 1998) ("We understand that our holding means that Section 9 of our Bill of Rights does not offer greater protection to the individual than the Fourth Amendment to the United States Constitution, and it may offer less protection."). Because of this parity between the provisions, the relative dearth of state court opinions addressing the issue on state grounds, and Defendant's lack of any citation to Texas case law differentiating between the provisions, the Court focuses on Speaks's Fourth Amendment arguments.

### A. The initial stop was justified.

Speaks does not contest the initial stop. He admits the officers had reasonable suspicion to initiate a traffic stop. ECF No. 65 at 236. Specifically, officers observed him drive without a valid license—a violation. TEX. TRANSP. CODE ANN. § 521.457. Before the stop, officers already identified Speaks as the driver and confirmed he held no valid driver's license. *Id.* at 75. He also failed to signal a lane change—another violation. TEX. TRANSP. CODE ANN. § 545.104. Officers observed the failure to signal prior to the stop. *Id.* at 78. Finally, Speaks operated a vehicle with illegally tinted windows—a third violation. TEX. TRANSP. CODE ANN. § 547.613. At the suppression hearing, officers testified they observed the vehicle and suspected an illegal window tint before initiating the stop. *Id.* Each of these violations justified the stop.

Though he does not dispute the officers had cause for the initial stop, Speaks seems to take issue with the stop's underlying purpose—to advance a narcotics investigation. ECF No. 49 at 5–6. However, pretextual stops are permitted. "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren v. United States*, 517 U.S. 806, 813 (1996); *see also United States v. Henry*, 853 F.3d 754, 757 (5th Cir. 2017). The subjective purpose of the stop had no bearing on its initial validity. Given Speaks' uncontested traffic violations, the officers justifiably initiated the traffic stop.

### B. Officers did not unreasonably or unjustifiably extend the stop.

Speaks next asserts the stop deviated from investigating the vehicle's window tint toward investigating Speaks' other activities. ECF No. 49 at 7. He correctly notes the officers could not lawfully extend the detention without additional reasonable suspicion. *See Illinois v. Caballes*, 543 U.S. 405, 407 (2005). Witnessing traffic violations is not enough. Otherwise, extending the stop would violate the second *Terry* step. But the government counters that its

9

officers neither extended Speaks' detention, nor lacked reasonable suspicion of his criminal engagements.

### 1. The officers needed help writing the ticket, so they did not unreasonably extend the stop by waiting for Officer Skaggs.

An unlawful extension occurs when a stop "is prolonged beyond the time reasonably required to complete" the mission which justified it. *Id.* at 407. When the purpose is to issue a warning ticket, then the stop may not last any longer than is reasonably necessary to do so. *See id.* But officers may still investigate during the stop. The Fifth Circuit has "reject[ed] any notion that a police officer's questioning, *even on a subject unrelated to the purpose of a routine traffic stop*, is itself a Fourth Amendment violation." *Brigham*, 382 F.3d at 508 (quoting *United States v. Shabazz*, 993 F.2d 431, 436 (5th Cir. 1993)).

Here, the officers checked Speaks' and Grady's information after stopping the car. ECF No. 65 at 83. Once they confirmed that Speaks did not have a valid license, Officers Kennedy and Kinnison proceeded to question Speaks and Grady. This questioning did not run afoul of the Fourth Amendment, even though Officer Kennedy asked Speaks questions about his criminal history and whether there were any drugs or guns in the car. After initial questioning, Kennedy called for a K-9 Unit. *Id.* at 89. By the time Officer Kennedy attempted to write the warning ticket for the vehicle's tinted windows, Officer Skaggs' K-9 Unit was already en route. *Id.* at 95–98. So, when Kennedy realized that neither he nor Kinnison could access the new ticket-writing software, they expected Skaggs would soon arrive to help. *Id.* They were correct. Skaggs was able to write the warning ticket on his phone after he conducted the dog-sniff. *Id.* at 100.

Because the Officers required Officer Skaggs' assistance to issue the warning ticket, waiting on his arrival did not impermissibly extend the traffic stop beyond its initial purpose. And once Officer Skaggs arrived, allowing Sharo to sniff around the car did not impermissibly

10

extend the stop either. *See Caballes*, 543 U.S. at 410 ("A dog sniff conducted during a concededly lawful traffic stop . . . does not violate the Fourth Amendment."). This Court cannot conclude that awaiting Officer Skaggs' arrival impermissibly extended the stop when the government has shown he was needed to complete the very purpose of the initial stop— issuing a citation for one of Speaks' three traffic violations.

### 2. Even if the stop was extended, the officers reasonably suspected Speaks was engaged in other criminal activity.

Even if Kennedy and Kinnison had extended the stop beyond what was reasonably necessary to investigate the traffic violations, such an extension is permitted when officers have reasonable suspicion of other criminal activity. When additional suspicion arises, "a traffic stop may last as long as is reasonably necessary to effectuate the purpose of the stop, *including the resolution of reasonable suspicion . . . that emerges during the stop.*" *Brigham*, 382 F.3d at 506 (emphasis added). If Kennedy and Kinnison had reasonable suspicion, they were entitled to "pursue a means of investigation . . . likely to confirm or dispel their suspicions quickly," *Pack*, 612 F.3d at 361, including a "graduated response to emerging facts." *Brigham*, F.3d at 509.

Reasonable suspicion is a relatively a low standard. Though "somewhat abstract," it "exists when the detaining officer can point to specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the . . . seizure." *United States v. Arvizu*, 534 U.S. 266, 274 (2002); *United States v. Pack*, 612 F.3d 341, 352 (5th Cir. 2010) (quoting *United States v. Estrada*, 459 F.3d 627, 631 (5th Cir. 2006)). These facts and inferences must support a likelihood that criminal activity is afoot. While "a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Arvizu*, 534 U.S. at 274 (internal marks omitted). Reasonable

11

suspicion often arises from facts which, individually, are "quite consistent with innocen[ce],"
but "taken together warrant[] further investigation." *United States v. Solokow*, 490 U.S. 1,
9–10 (1989). When assessing reasonable suspicion, courts must give "due regard to the
experience and training of the law enforcement officers." *Brigham*, 382 F.3d at 507.

When Kennedy and Kinnison stopped Speaks, they knew the following: Speaks was
seen visiting a residence suspected of drug distribution earlier that day—the "Trapp" house.
ECF No. 65 at 34. Speaks had prior convictions for drug offenses. *Id.* at 44. Speaks was
driving a vehicle with tinted windows along I-40, a known drug-trafficking corridor. *Id.* at
78; *see also United States v. Lopez*, No. 2:21-CR-51-Z-(2), 2021 WL 5746006, at *4 (N.D. Tex.
Dec. 2, 2021) (holding presence on I-40 was a factor supporting reasonable suspicion). After
visiting the "Trapp" house, Speaks went to the Red Roof Inn, which officers recognized as a
common site for illegal activity. *Id.* at 140. And Speaks had no valid driver's license to operate
the vehicle he had been driving. *Id.* at 75. Officers Kennedy and Kinnison knew all of this
before they ever stopped the vehicle.

After performing the stop, the officers observed other suspicious activity. Speaks
stopped the car on an improved shoulder instead of taking the nearby exit ramp, leaving little
room for officers to approach the driver's side. *Id.* at 79. In Officer Kinnison's training and
experience, some drivers park on cramped shoulders to make it difficult for officers to
approach—thereby (hopefully) shortening the stop. *Id.* at 139. Then, during questioning,
Speaks became agitated and accused them of harassment. *Id.* at 89–90. During this
exchange, Officer Kinnison observed that Speaks' attire displayed the color blue on nearly
every article—his pants, underwear, hoodie, hat, and shoes. *Id.* at 85. Kinnison knew from
experience that members of the "Crips" gang often displayed blue on their clothing. *Id.* When
Officer Kinnison questioned Grady, he noted that while she flatly denied the presence of

12

marijuana and cocaine in the car, her answer differed when asked if there were any *firearms* present. *Id.* at 86–88. While she previously answered "no" unequivocally, she responded to the firearm inquiry by saying there were none *she knew of*, then asserted that she was only a recent passenger—Speaks picked her up shortly before the stop. *Id.* Officer Kinnison took this shift in response to suggest a possibility that weapons were present and Ms. Grady was distancing herself from culpability. *Id.*

Were this an extended stop, Officers would need reasonable suspicion before the stop became extended. *See, e.g., Martinez v. State*, 348 S.W.3d 919, 923 (Tex. Crim. App. 2011). The Court already determined the stop was not extended. But even if it were, the Officers likely had reasonable suspicion from the outset, which merely grew as the stop progressed. The government has identified *United States v. Conley* as an analogous case. *See* No. 22-10923, 2023 WL 5938185, at *2 (5th Cir. Sept. 12, 2023). In *Conley*, the Fifth Circuit upheld a finding of "reasonable suspicion" when officers detained a suspect who (1) drove a vehicle registered to another, (2) had a criminal history and was on supervised release, (3) was "present in the parking lot of a motel known for drug trafficking and prostitution," (4) had tattoos indicating a gang affiliation, and (5) failed to produce a valid driver's license. The Court held each of these factors, though individually insufficient, could "contribute to a finding of reasonable suspicion." *Id.* at *1. And, in "totality," these observations supported reasonable suspicion. *Id.* at *2. Just so here.

When Kennedy and Kinnison stopped Speaks, the officers knew (1) he was driving a vehicle registered to Grady, (2) he had a criminal history and was on supervised release, (3) he was present first at a residence suspected of drug distribution, then a hotel known for frequent illegal activity, (4) his clothing and criminal history indicated possible gang affiliation, and (5) Speaks drove a vehicle with tinted windows and could not produce a valid

13

driver's license. These facts map almost perfectly onto those which supported a finding of reasonable suspicion in *Conley*.

But officers knew more than just that. Before conducting the stop, Kennedy and Kinnison communicated with other officers investigating Speaks. This included Officer Mincher and Officer Lichtie, who relayed important information. Kennedy and Kinnison were allowed to consider facts learned while communicating with their colleagues that day.

When multiple officers coordinate in an investigation, no individual's suspicion develops in a vacuum. The Fifth Circuit allows "reasonable suspicion" to generate from the combined knowledge of investigating officers who are communicating with one another. *See United States v. Powell*, 732 F.3d 361, 369 (5th Cir. 2013). Under the Collective Knowledge Doctrine, "reasonable suspicion can vest through the collective knowledge of officers involved," so long as there is "some degree of communication" between them. *Id.*

Here, Mincher and Lichtie informed Kennedy and Kinnison of Speaks' visit to a suspected narcotics house, as well as his criminal history and his previous stop in the same vehicle (during which a fugitive had been apprehended). ECF No. 65 at 135.

By adding Mincher and Lichtie's communications into the equation, the Court finds *Utah v. Strieff* instructive. *See* 579 U.S. 232, 241 (2016). In that case, the Supreme Court held an arrest warrant was an attenuating circumstance that remedied a stop without reasonable suspicion. *Id.* Officers conducted a *Terry* stop on an individual leaving a house suspected of drug distribution. Though the officers thought he was a "short-term visitor," they failed to note his entry and exit times. *Id.* Without documenting the entry and exit times, they "lacked a sufficient basis to conclude that Strieff was a short-term visitor who may have been consummating a drug transaction." *Id.* In his opinion for the Court, Justice Thomas identified

14

this failure as the chief mistake by law enforcement. The opinion thus implied that the officers *would have had* reasonable suspicion if they noted the suspect's entry and exit times.

Unlike the officers in *Strieff*, here Officer Mincher noted what time Speaks entered and exited the "Trapp" house. According to Mincher's report, as well as his subsequent testimony, Speaks arrived at the "Trapp" house at 12:55 p.m. and left at 1:15 p.m., staying for a mere twenty minutes. ECF No. 65 at 54. Mincher testified this length of time was consistent with a drug deal, and matched the amount of time other short-term visitors had spent at the "Trapp" house. *Id.* at 38. According to Mincher, he later relayed this information to Kennedy and Kinnison before they stopped Speaks. *Id.* at 34, 44. This, in combination with information about Speaks' recent stop and the observations made by Kennedy and Kinnison before and during their stop, were "specific and articulable facts" supporting a "rational inference"—far beyond a "mere hunch"—that Speaks was engaged in criminal activity. *Pack*, 612 F.3d at 352.

Mincher and Lichtie's *uncommunicated* knowledge is also relevant. Fifth Circuit precedent articulating the Collective Knowledge Doctrine does not limit courts to considering only information which was communicated in fact. Rather, the Doctrine allows courts to consider the collective knowledge of multiple officers so long as there is "*some degree of communication*" between them. *Powell*, 732 F.3d at 369 (emphasis added). Under that construction, the Court might also weigh Lichtie's knowledge in determining whether "reasonable suspicion" existed. During surveillance, Lichtie recalled Speaks' prior statements about his gang involvement, methamphetamine addiction, and reputation as a "fighter" and a "shooter" who always packed a firearm. ECF No. 65 at 59, 61–62. And Mincher also observed Speaks reverse-park his vehicle at the Red Roof Inn, a known crime haven. *Id.* at 30.

15

But it matters little. Whichever set of facts the Court considers, whether including Mincher and Lichtie's uncommunicated knowledge or not, the Court finds Kennedy and Kinnison would have had reasonable suspicion to extend the stop.

## II. The canine sniff of Grady's vehicle did not violate Speaks' rights.

Alone, a free air sniff by a police canine does not constitute a search. The Supreme Court holds that a "dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment." *Caballes*, 543 U.S. at 410. In accordance with *Caballes*, the Fifth Circuit has recognized that a "dog sniff is typically not a search; it may be conducted even when a detention is not drug-related so long as it does not unreasonably prolong the detention." *United States v. Beene*, 818 F.3d 157, 162 (5th Cir. 2016).

### A. Sharo's leap into the car was not a search.

Speaks argues the free air sniff became a *search* when Sharo jumped through the car's front passenger window. Citing *Jones* alongside cases from Idaho state court (which do not bind this Court), he first asserts a dog's entry into a car is always a search because it is an intrusion into a protected space. *United States v. Jones*, 565 U.S. 400 (2012); *State v. Randall*, 496 P.3d 844 (Idaho 2021); *State v. Howard*, 496 P.3d 865 (Idaho 2021); *State v. Dorff*, 526 P.3d 988 (Idaho 2023); ECF No. 56 at 7–8. Second, he argues law enforcement improperly caused the intrusion by (1) leaving the window open, and (2) training Sharo to jump through car windows. ECF No. 56 at 5–6.

Considering the weight of precedent in this and other circuits, Speaks' first argument fails. When a drug-sniffing dog touches or enters a car, courts have time and again held it does not violate a suspect's Fourth Amendment rights if law enforcement officers did not

16

intentionally cause the dog's behavior. *See United States v. Shen*, 749 Fed. App'x 256, 262 (5th Cir. 2018) (holding a dog's partial entry through the window, following its handler's routine hand motion, was not a search); *United States v. Keller*, 123 F.4th 264, 268 (5th Cir. 2024) ("Numerous circuits agree that, absent police misconduct, the instinctive actions of a trained canine—including placing his paws on a vehicle's exterior—constitute incidental contact, not an unconstitutional Fourth Amendment search."); *United States v. Wilson*, No. 22-20100, 2024 WL 3634199, at \*2 n.1 (5th Cir. Aug. 2, 2024) (per curiam); *United States v. Sharp*, 689 F.3d 616, 619 (6th Cir. 2012) ("We now join our sister circuits in holding that a trained canine's sniff inside of a car after instinctively jumping into the car is not a search that violates the Fourth Amendment as long as the police did not encourage or facilitate the dog's jump."); *United States v. Pierce*, 622 F.3d 209, 214–15 (3d Cir. 2010) ("[W]e apply the considerable body of jurisprudence examined above to conclude that [a dog's] interior sniffs, as a natural migration from his initial exterior sniffs, did not constitute a search requiring a warrant or probable cause."); *United States v. Lyons*, 486 F.3d 367, 373 (8th Cir. 2007) ("Absent police misconduct, the instinctive actions of a trained canine do not violate the Fourth Amendment.").

While Speaks' reliance on *Jones* is understandable, the Fifth Circuit (among others) disagrees with his interpretation. *See, e.g., Keller*, 123 F.4th at 268. In *Jones*, the Supreme Court held law enforcement engaged in a warrantless search by placing a tracking device on a defendant's vehicle. 565 U.S. at 413. The Court invoked "property rights" to reach its decision. *Id.* at 405. But the property approach has not yet eclipsed the "reasonable expectation of privacy" test. Why? Maybe *Jones* is too new, still lacking the necessary "case percolation" through the Circuits. Or maybe a "property test" is unworkable in too many scenarios. *See* Orin S. Kerr, *The Curious History of Fourth Amendment Searches*, 2012 SUP.

17

CT. REV. 67, 69 (2012) (arguing that, as an originalist matter, "there is no trespass test to restore . . . . Both today and when the Fourth Amendment was adopted, trespass has been a protean concept that can be construed broadly or narrowly."); *see generally* Will Baskin, Note, *Trespass to Chattel and the Fourth Amendment*, 11 TEX. A&M J. PROP. L. 285, 298–99 (2025) (criticizing the Idaho Supreme Court's interpretation of *Jones* and describing workability problems with focusing on property rights in Fourth Amendment analysis). But perhaps the most plausible explanation is that, more than property rights or expectations of privacy, *reasonableness* lies at the heart of the Fourth Amendment inquiry. *See* Amar, *supra*, at 759; *Robinette*, 519 U.S. at 39.

Why, then, might the actions leading to Sharo's jump be reasonable, while the officers' actions in *Jones* were not? One obvious differentiator is intent. Law enforcement clearly *intended* to connect the device to the defendant's property in *Jones*. Their very actions bespoke intent. But here the officers, for reasons discussed below, clearly did not *intend* for Sharo to enter the car. In any event, the Fifth Circuit has held a drug dog's entry into a vehicle is not a *per se* search. *See Shen*, 749 Fed. App'x at 262; *Keller*, 123 F.4th at 268; *Wilson*, 2024 WL 3634199, at *2 n.1. That fact alone defeats Speaks' first argument.

Speaks next argues officers improperly caused Sharo to jump, first by leaving the window open, second by training Sharo to jump through car windows. Speaks aptly cites *Sharp*, a Sixth Circuit case which the Fifth Circuit has approvingly referenced, for the notion that a dog's entry into a vehicle is a search when intentionally facilitated by law enforcement. *See* 689 F.3d at 620; *Keller*, 123 F.4th at 269. *Sharp* suggested it would be "a Fourth Amendment violation for a narcotics detection dog to jump into a car because of something the police did, like training the dog to jump into cars *as part of the search* . . . ." *Id.* (emphasis added).

While Speaks complains of a "set-up," the facts paint a very different picture. First, officers did not open the window. The suppression hearing testimony and video evidence proved it was Grady who opened the window, not the officers. At one point she rolled it up—partially closing it—at the request of Officer Kinnison so he could perform a test on the window tinting. ECF No. 65 at 92–93. Afterwards, he gave her no direction to roll it back down. Neither did any other officer direct the window to be opened. *Id.* at 177. While Kennedy and Kinnison did not actively seek to close the window, they had "no affirmative duty" to do so. *Sharp*, 689 F.3d at 620.

In fact, testimony showed the police canine handlers prefer windows to be closed. ECF No. 65 at 201, 208. Simply put, a closed window "traps" odors, but an open window disperses odors. A closed window therefore makes it easier for a dog to detect the scent of narcotics. *Id.* Handlers also prefer closed windows for safety reasons. If a dog gets into a car, it might easily ingest harmful substances. *Id.* at 201, 228. And Kennedy and Kinnison testified that they had heard canine handlers preferred closed windows. *Id.* at 128–29, 156. This negates Speaks' accusation of intentional malfeasance by the officers. By all accounts, the open window was against their interest.

Speaks also alleges Sharo was trained to jump through windows. ECF No. 56 at 5. This is partially true. Speaks offers two training reports showing that Sharo was trained to jump through car windows, as well as one other example of an APD canine jumping into a vehicle during a drug-sniff. Oddly enough, the reports stated Sharo struggled to jump through windows. But, more importantly, this training was for suspect apprehension, *not* narcotics searches. *See* Def.'s Ex. 8; Def.'s Ex. 9; ECF No. 65 at 171, 174, 226. While Sharo was trained for both tasks, he had a distinct "command" word to initiate an apprehension exercise, as opposed to a narcotics search. ECF No. 65 at 167. Therefore, Sharo was not

19

trained to jump *"as part of the search." Sharp*, 689 F.3d at 620 (emphasis added). Skaggs testified that he has worked with Sharo since 2021 and it is very rare for him to jump into a car during a narcotics search. ECF No. 65 at 161, 169. Skaggs could only recall two or three instances, each of which was followed by corrective training. *Id.* at 203–04. None had occurred recently. *Id.* at 204. And the other example cited by Speaks occurred years earlier (in 2022) and involved a different dog with a different handler. *Id.* at 215–16. That handler also testified the jump was unintentional and uncommon. *Id.* at 219.

Another handler familiar with Sharo expressed surprise after hearing about Sharo's jump. *Id.* at 228. That is because Sharo is a "soft dog." *Id.* at 178, 225. As a soft dog, he is less aggressive and more sensitive to correction. Had Skaggs restrained Sharo, pulled on him, or otherwise disciplined him while he was "in odor," it could have negatively impacted his training. *Id.* at 180, 184. According to Skaggs, that is why he did not immediately and forcibly remove Sharo from the vehicle until he had finalized the alerting behavior which began outside the car.

In light of this testimony, the Court finds the government effectively rebutted any suggestion of intentional wrongdoing by law enforcement while conducting the dog-sniff. Indeed, the government affirmatively showed its officers acted reasonably under the circumstances and without malicious intent. Sharo's inadvertent and unexpected leap into the car did not violate Speaks' Fourth Amendment rights.

### B. Next, even if Sharo's entry was a search, video and testimonial evidence suggests he alerted *before* entering the car.

A trained and certified drug dog's alert gives officers "probable cause." The Supreme Court has held that "[i]f the State has produced proof from controlled settings that a dog performs reliably in detecting drugs, and the defendant has not contested that showing, then the court should find probable cause." *Florida v. Harris*, 568 U.S. 237, 248 (2013). Sharo was

trained and certified at the time of the stop. ECF No. 65 at 165–66.

A dog's alert supports probable cause for a warrantless car search. *Harris*, 568 U.S. at 248. It follows that, even had the canine's leap been a search, it would have been justified or rendered harmless by a prior alert. *See, e.g., Pierce*, 622 F.3d at 215; *Medina v. State*, 565 S.W.3d 868, 877 (Tex. Ct. App. 2018), *pet. ref'd*. For the following reasons, the Court finds such a prior alert existed here.

A dog's alert does not require any specific, final action. *See Shen*, 749 Fed. App'x at 261. Rather, the alert comes from behaviors specific to the canine, which indicate to its handler that the dog is responding to odors from an illicit substance. ECF No. 65 at 164. As the Supreme Court has instructed, "[t]he question—similar to every inquiry into probable cause—is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime. A sniff is up to snuff when it meets that test." *Florida v. Harris*, 568 U.S. 237, 248 (2013). Therefore, an alert exists when the handler reasonably believes the canine has detected narcotics.

The Court heard testimony at the suppression hearing that Sharo's typical final response is to "sit." ECF No. 65 at 210. However, Sharo's handler also described other responsive behaviors. These behaviors often come in sequence as the dog's excitement increases. *Id.* First, Sharo's breathing changes. Second, his body language changes. Third, he looks back and forth between his handler and the locus of an odor. Fourth, he sits. *Id.* at 211. While sitting is often Sharo's *final* response, these other behaviors demonstrate an escalating likelihood that Sharo is detecting narcotics. *Id.* at 210.

According to the video from Officer Kinnison's body camera, as well as the testimony of Officer Skaggs, Sharo exhibited all three of his other indicating behaviors *before* he jumped

21

into the car. *Id.* at 184–85, 190, 211; Def.'s Ex. 5, at 16:27:20–16:27:43. Skaggs testified that Sharo's breathing changed as he approached the passenger door. He then placed his paws on the vehicle, wagged his tail, and looked back and forth between Skaggs and the vehicle. ECF No. 65 at 210–11. Only then did Sharo leap into the open car window. Because no "full and final alert" was required, Sharo's multiple indications of being "in odor" were enough for a reasonable officer to conclude he had alerted. *Shen*, 749 Fed. App'x at 261; ECF No. 65 at 184–185, 190, 205, 210–11. This means probable cause existed *before* Sharo leapt into the car.

Because Sharo's leap was not a search, and because Sharo's alert (before or after he entered the car) gave the officers probable cause to search the vehicle, evidence uncovered from the search was not obtained in violation of Speaks' Fourth Amendment rights.

### CONCLUSION

The government has carried its burden by showing, by a preponderance of the evidence, that it did not violate Speaks' Fourth Amendment rights. Because the provisions have been interpreted nearly identically, neither did officers violate Speaks' rights under Article I, Section 9 of the Texas Constitution. The Court finds no extended detention occurred. Even if it had, officers had reasonable suspicion to extend the stop. The Court also finds the drug-dog's leap into the vehicle was not a search. But even if it were a search, it would have been justified by Sharo's prior alert. Therefore, the evidence discovered pursuant to the stop and search did not result from a violation of Speaks' rights and suppression is unwarranted. The Court accordingly **DENIES** the Motion.

**SO ORDERED**.

October __6__, 2025.

MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE